UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELLEN WILLIAMS,

      Plaintiff,

    v.

CITY OF PLEASANTON, et al.,

      Defendants.

Case No. 20-cv-08720-WHO

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT AND GRANTING MOTIONS FOR SANCTIONS IN PART**

Re: Dkt. Nos. 179, 180, 181, 188

    Plaintiff Ellen Williams filed a number of claims against two sets of defendants following events on November 14, 2019, at ValleyCare hospital in Pleasanton, California. The first set of defendants are individuals who worked at ValleyCare as well as the hospital itself ("ValleyCare Defendants"[1]) and the second set are police officers who responded to ValleyCare at the request of the ValleyCare Defendants and were involved in the removal of Williams from ValleyCare, her arrest, and her booking into Santa Rita jail ("Pleasanton Defendants").[2]

    Both sets of defendants move for full or partial summary judgment and also move for sanctions related to Williams violating prior court orders. For the reasons discussed below, the motions for summary judgment are GRANTED and the motion for sanctions are GRANTED in part.

## BACKGROUND

    The factual background and allegations giving rise to this case are extensively discussed in prior Orders. *See* Dkt. Nos. 63, 91, 100. The undisputed and disputed material facts relevant to

---

[1] The ValleyCare Defendants are Arianna Frangieh, Meghan Ramsey, Diane Del Rosario Estrada, Emily Nitro, and ValleyCare (aka The Hospital Committee for the Livermore-Pleasanton Areas and Stanford Healthcare dba Stanford Healthcare – ValleyCare).

[2] The Pleasanton Defendants are the City of Pleasanton, the Pleasanton Police Department, and Police Officers Katie Emmet, Anthony Pittl, Barry Boccasile, and Michael Bradley.

United States District Court
Northern District of California

United States District Court
Northern District of California

each of the remaining claims will be addressed below.  Following the motion to dismiss rulings, the following claims were left against the following defendants:

- Battery (Fourth Cause of Action) against Arianna Frangieh and ValleyCare based on the alleged pushing of Williams at the hospital.

- Malicious prosecution (Seventh Cause of Action); against Valley Care Defendants Frangieh, Ramsey, Estrada, and Nitro based on alleged acts those defendants took to convince the District Attorney to criminally charge Williams with battery and resisting arrest.

- Violation of 42 U.S.C. § 1983 (First Cause of Action) against the Pleasanton Defendants based on deprivation of liberty without due process, the right to be free from unreasonable search or seizure, and the right to equal protection.

- False Arrest/False Imprisonment (Third Cause of Action), against the Pleasanton Defendants based on Williams's detention by the police officers and arrest.

- Negligence (Second Cause of Action) against the Pleasanton Defendants.

- Violation of the Ralph Act, Cal. Civ. Code §51.7 (Fifth Cause of Action), against the Pleasanton Defendants based on threats of violence because of Williams's race.

- Violation of the Bane Act, Cal. Civil Code § 52.1 (Sixth Cause of Action), against the Pleasanton Defendants based on the violation of Williams's constitutional rights.

Both sets of defendants move for summary judgment, or partial summary judgment.  Dkt. Nos. 179, 181.  Defendants also move for sanctions based on alleged violations of my prior Order requiring Williams, Dr. Williams, and another third-party to sit for a further deposition and my prior Order prohibiting Williams from communicating directly with defense counsel.  Dkt. Nos. 180, 188.

## LEGAL STANDARD

### I.    SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must

2

United States District Court
Northern District of California

1  show the absence of a genuine issue of material fact with respect to an essential element of the

2  non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

3  persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

4  made this showing, the burden then shifts to the party opposing summary judgment to identify

5  "specific facts showing there is a genuine issue for trial."  *Id*.  The party opposing summary

6  judgment must then present affirmative evidence from which a jury could return a verdict in that

7  party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

8      On summary judgment, the Court draws all reasonable factual inferences in favor of the

9  non-movant.  *Id*. at 255.  In deciding a motion for summary judgment, "[c]redibility

10  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

11  facts are jury functions, not those of a judge."  *Id*.  However, conclusory and speculative testimony

12  does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

13  *Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).

## II.      COMPELLING DISCOVERY & SANCTIONS

15      "The court may impose an appropriate sanction—including the reasonable expenses and

16  attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair

17  examination of the deponent."  Fed. R. Civ. P. 30(d)(2).  As a form of discovery sanction, the

18  district court has broad discretion to determine the appropriate sanction.  *See Nat'l Hockey League*

19  *v. Metro. Hockey Club, Inc*., 427 U.S. 639, 642 (1976) (citing authorities).

20      Under Rule 37, if a motion to compel discovery is granted, the court must, after giving an

21  opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the

22  party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred

23  in making the motion, including attorney's fees. But the court must not order this payment if: (i)

24  the movant filed the motion before attempting in good faith to obtain the disclosure or discovery

25  without court action; (ii) the opposing party's nondisclosure, response, or objection was

26  substantially justified; or (iii) other circumstances make an award of expenses unjust."  Fed. R.

27  Civ. P. 37(a)(5)(A).

28      Further, under Rule 37(b)(2)(A), if a party "fails to obey an order to provide or permit

3

discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." *Id.*  In addition, under 37(b)(2)(C), "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

Outside of Rule 37, there are "[t]hree primary sources of authority enable courts to sanction parties or their lawyers for improper conduct: (1) Federal Rule of Civil Procedure 11, which applies to signed writings filed with the court, (2) 28 U.S.C. § 1927, which is aimed at penalizing conduct that unreasonably and vexatiously multiplies the proceedings, and (3) the court's inherent power." *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001).  The sanctions at issue in this motion arise under both Rule 37 but also the Court's inherent power.

"Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (internal quotation marks, citation, and formatting omitted); *see also Fink v. Gomez*, 239 F.3d 989, 991–92 (9th Cir. 2001) (explaining that inherent authority sanctions can be appropriate for willful disobedience of a court order, acting in bad faith, or willful abuse of the judicial process).

The moving party has the burden to show by clear and convincing evidence that the contemnors violated a specific and definite order of the court.  The burden then shifts to the contemnors to demonstrate why they were unable to comply.  *F.T.C. v. Affordable Media*, 179

4

F.3d 1228, 1239 (9th Cir. 1999) (internal quotation marks and citation omitted).  "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986). "Compensatory awards are limited to actual losses sustained as a result of the contumacy."  *Id.* (internal quotations and emphasis removed).

## DISCUSSION

## I.    VALLEYCARE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    Battery by Frangieh Against Williams

#### 1.    Legal Standard

Under California law, the elements of battery are, "(1) defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to plaintiff." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 526–27 (2009) (internal citations omitted).[3]

#### 2.    Dispute: Who Committed the Alleged Battery

The ValleyCare Defendants argue that Williams's battery claim against Frangieh and ValleyCare must be dismissed because there is no evidence – apart from the testimony of Williams and her husband Dr. Williams – that Nurse Frangieh pushed Williams much less that the pushing was intentional.  Comparing the declarations and deposition testimony offered by both sides, it is undisputed that Williams pulled the room curtain closed when Frangieh was on the other side and requested that Frangieh not come in the room and/or leave the room.  It is disputed what happened next; whether Frangieh pushed Williams (as Williams and Dr. Williams allege) or whether Williams shoulder checked Frangieh (as Frangieh alleges and as supported by witness

---

[3] The civil tort of assault or battery requires showing a wrongful act ("either an attempt to commit physical injury (assault) or a harmful contact (battery)" and "resulting harm, such as emotional distress or physical injury."  *See* 5 Witkin, Cal. Proc. 6th Plead § 763 (2023).  In contrast, a misdemeanor criminal charge for "Simple Assault or Battery" under Penal Code 242, does not require infliction of injury or emotional distress.  *See* 1 Witkin, Cal. Crim. Law 4th Crimes--Person § 16 (2023).

United States District Court
Northern District of California

Nurse Estrada). *Compare* Declaration of Ellen Williams (Dkt. No. 191-1) ¶¶ 12-13; Declaration of Dr. Michael Williams (Dkt. No. 191-2) ¶¶ 11-12; *with* Declaration of Arianna Frangieh (Dkt. No. 179-27) ¶¶ 5-6;  Declaration of Dianne Del Rosario Estrada (Dkt. No. 179-25) ¶¶ 4-5; *see also* Deposition Tr. Arianna Frangieh, Declaration of Adam M. Stoddard (Dkt. No. 179-2), Ex. 17, at 27:24-28:3; 41:21-42:13; 54:20-55:23; 57:10-13; 58:3-15; 61:7-61:21; 62:1-62:25; 76:8-15.

In addition to the testimony of their witnesses, the ValleyCare Defendants point to the contents of the staff reports from hospital security from that day documenting that Williams shoved Frangieh as Frangieh was trying to leave Dr. Williams' hospital room. Stoddard Decl., Ex. 12 (Dkt. No. 179-14), Deposition Tr. of Officer Diamond Ebojo at 21:9-16.  They also note that the police report following the incident confirms the same story.. Stoddard Decl., Ex. 1 (Dkt. No. 179-3) at PPD 000001; PPD 000013 ("Girma used her shoulder to push into a nurse at Stanford Valley Care Hospital…Girma [also known as Ellen Williams] resisted arrest and refused to comply with officers [sic] commands."); *see also id*. at PPD 000004; PPD 000013 (Williams told officers she was "aggressive" towards hospital staff because she felt like her husband had been mistreated, and the level of her husband's medical care and provided that was the reason she was "aggressive" with hospital staff).

The contents of the body worn footage of the police officers who responded to the scene show various individuals similarly reporting that Frangieh was pushed by Williams.  Declaration of Noah G. Blechman (Dkt. No. 181-1), Ex. N-1 at 14:41:53, 14:42:30, 14:43:54, 14:46:37, 15:18:30-15:21:13; 15:31:34 (synchronized body worn camera ("BWC")[4] footage from all four officers on the scene).  When informed by Officer Pittl that Williams had to leave given her conduct including her "assault" on staff, Williams did not say that she herself was assaulted. *Id*. at 15:36:17-15:40:53.

At the scene, Frangieh confirmed with the officers that she wanted to press charges for

---

[4] All cites to the BWC are to the synchronized version at Ex. N-1.  Williams makes no objection to the admissibility of the BWC footage or to any aspect of it, other than arguing it does not capture the whole interaction with Williams (once officers enter the hospital room).  Williams and defendants do not dispute that after the officers engaged with Williams, at one point Officer Emmet's camera gets knocked off and Officer Boccasile's camera turns off.

United States District Court
Northern District of California

battery, even though she was not "injured" or needed medical attention due to the push.  PPD 000003, BWC 14:48:24.  A few days later, Frangieh filed a workers' compensation claim and saw an occupational health doctor due to her anxiety and trouble sleeping following the incident.  Frangieh confirmed to the claims administrator that her symptoms were due to Williams's battery, and Frangieh was put on leave.  Frangieh Depo. Tr. at 26:17-24; 27:7-29:16; 33:2-20; Stoddard Decl., Ex. 5, Deposition Tr. of Kelly Drechsler (Dkt. No. 179-7), at 16:12-19, 17:3-5, 19:6-17, 20:15-21:13, 22:1-16, 23:2-24:7, 24:21-25:2.

There is no direct or circumstantial evidence that Williams was pushed by Frangieh – and not the other way around – other than the declarations of Williams and Dr. Williams.  Both declare that it was Frangieh that pushed Williams as Williams was closing the curtain and attempting to prevent Frangieh from re-entering the room.  Declaration of Ellen Williams, Dkt. No. 191-1; Declaration of Dr. Michael Williams, Dkt. No. 191-2.  Despite the otherwise consistent direct and circumstantial evidence showing that Williams was the one who battered Frangieh and that Frangieh did not push or batter Williams, Williams and her husband's declarations create a dispute of material fact.

The ValleyCare Defendants attempt to side-step the dispute of material fact over who pushed whom by trying to discredit those declarations.  First, defendants characterize Dr. Williams's declaration as a "sham affidavit" because he provides more details and clarity regarding the circumstances of the alleged battery by Frangieh against his wife than he was able to offer in his deposition.  ValleyCare Reply (Dkt. No. 197) at 6-8.[5]  Defendants take the same tack with Williams, noting that in her deposition Williams claimed that she did not know what body part Frangieh, who was behind the curtain, pushed her with.  In her declaration Williams now attests that Frangieh "laid her hands" on Williams.  *Id*.

In light of this evidence, I find that there is a dispute of material fact.  That both Williams

---

[5] "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co*., 952 F.2d 262, 266 (9th Cir.1991)).  This sham affidavit rule prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony," which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id*. at 266 (internal quotation marks omitted).

and Dr. Williams provided more details and clarity in their declarations than they did in their depositions regarding how Frangieh pushed Williams may be grist for cross-examination at trial, but it does not conclusively show that either declaration is a "sham." They do not directly contradict admissions or evidence that they gave in their depositions.

Despite the seemingly lopsided evidence in the ValleyCare Defendants' favor, there is a dispute of material fact precluding summary judgment on this ground.

### 3. No Dispute: No Injury

However, summary judgment is appropriately granted on Williams's battery claim for a different reason. An element of the civil tort of battery is that the "harmful or offensive contact caused injury, damage, loss or harm to plaintiff." *Brown*, 171 Cal.App.4that 526-27. In her deposition, Williams repeatedly admitted that she was not injured by the push. *See* Pl. Depo. Tr., Dkt. No. 179-6, at 326:12-327:13 ("There was no injury. It was just a push. . . ."). She submits no evidence in opposition to summary judgment that she sustained any "injury, loss, damage or harm" from the purported push Frangieh inflicted on her.

Williams's opposition brief does not address the "injury, loss, damage or harm" element whatsoever, much less identify evidence to support that element. And when asked at the hearing to identify Williams's injury or harm from the battery, her counsel admitted there was none. Tr. November 1, 2023 Hearing ["Transcript," Dkt. No. 207] at 10:1-6; 11:1-3.[6]

Based on undisputed evidence, the ValleyCare Defendants' motion for summary judgment on the battery claim is GRANTED.

### B. Malicious Prosecution Claim: No Evidence that Defendants Contacted District Attorney

The ValleyCare Defendants also move for summary judgment on Williams's malicious

---

[6] At the hearing on these motions, Williams's counsel attempted to argue that because Williams suffered no injury from the alleged push by Frangieh, the ValleyCare and Pleasanton Defendants had *no cause* to enact a citizen's arrest of Williams as a result of the alleged battery by Williams on Frangieh. Transcript at 10:1-6; 11:1-11. However, the elements of a criminal misdemeanor battery and a civil tort battery are different. *See supra* pg. 5 n.3. There is ample evidence submitted by defendants, on the other hand, that Frangieh suffered actual harm from the alleged battery by Williams; including the resulting anxiety and sleep deprivation that led to her filing a worker's compensation claim and seeing an occupational doctor. *See supra* pgs. 6-7.

United States District Court
Northern District of California

prosecution claim based on her belief that the individual ValleyCare Defendants made calls and otherwise communicated with and encouraged the District Attorney's office to file the criminal battery and resisting arrest charges against Williams.  There is no evidence to support this claim.

### 1.    Legal Standard

"Under the governing authorities, in order to establish a cause of action for malicious prosecution of either a criminal or civil proceeding, a plaintiff must demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor []; (2) was brought without probable cause []; and (3) was initiated with malice [].'" *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal.3d 863, 871 (1989) (citations omitted).  "Cases dealing with actions for malicious prosecution against private persons require that the defendant has at least sought out the police or prosecutorial authorities and falsely reported facts to them indicating that plaintiff has committed a crime.") (internal quotation omitted). *Greene v. Bank of America*, 216 Cal.App.4th 454, 463-464 (2013)

### 2.    No Evidence Of Contact With the District Attorney

It is undisputed that Williams was charged with resisting arrest under California Penal Code section 148(a)(1) and battery under California Penal Code section 243(b).  The charging Deputy DA, Sharon Carney, testified in her deposition that she alone made the decision to charge Williams, based solely on the police report.  She did not interview or communicate with any of the ValleyCare Defendants, and relied on the police report to determine the facts alleged supported the charges.  Deposition Transcript of Sharon Carney, Dkt. No. 179-4, at 12, 23-24, 25-34.

Deputy DA Georgia Santos testified that she dismissed the charges against Williams not because of insufficient evidence, but because (i) she took pity on Williams, who had no criminal history, (ii) COVID was impacting the jails, and (iii) Williams had been clearly stressed about her husband's treatment at ValleyCare and his condition.  Deposition Transcript of Georgia Huang Santos, Dkt. No. 179-5, at 40-41.  Each ValleyCare Defendant declares that she did not call, email, text or otherwise communicate with the District Attorney's office at all.  Frangieh Decl., ¶ 7; Estrada Decl. ¶ 6; Declaration of Meghan Ramsey (Dkt. No. 179-29) ¶ 6; Declaration of Emily Nitro (Dkt. No. 179-28), ¶ 4; Declaration of Anita Girard (Dkt. No. 179-26), ¶ 4.

United States District Court
Northern District of California

1    Williams opposes summary judgment, relying only on an assertion (made in a declaration

2    submitted in connection with a different motion) that she was told by a "staff member" at the

3    District Attorney's office "whom she believes to be Jessica Juarez," that the defendants had

4    phoned a number of times to encourage and promote the prosecution.  Pl. Oppo. ValleyCare MSJ

5    at 2-3.  In her declaration opposing the ValleyCare defendants' motion for summary judgment,

6    Williams simply declares without citing any proof that "the ValleyCare entity defendants, acting

7    through at least defendant Frangieh, Girard, Ramsey, Nitro, and Estrada, sent correspondence and

8    made phone calls urging and encouraging the City Attorney to file a formal criminal case against

9    me, and then to pursue that case."  Dkt. No. 191-1, ¶ 39.

10    Williams fails to identify any evidence to support this claim.  She produced no

11    correspondence and no phone records, which she could have sought in discovery.  She has

12    produced no admissible testimony from anyone with personal knowledge that communications

13    were made by any ValleyCare Defendant to anyone at the District Attorney's Office.  Her

14    assertion that she was told by someone named "Juarez" who worked at the District Attorney's

15    Office that "defendants" had communicated with the office is inadmissible hearsay that cannot

16    create a dispute of material fact.  But even more problematic, in her declaration Deputy DA Santos

17    declares that Juarez never told her about any conversations she had with Williams; critically,

18    Juarez was not even hired until 8 months *after* the criminal charges had been dismissed.

19    Declaration of Georgia Santos, Dkt. No. 179-18, ¶ 3.

20    There is simply *no evidence* to support Williams's belief that ValleyCare Defendants

21    communicated with the District Attorney's Office to urge or encourage the District Attorney's

22    office to file the criminal charges.  Defendants' motion for summary judgment on the malicious

23    prosecution claim is GRANTED.[7]

24    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25    [7] Given that ruling, I need not reach whether Williams has identified material disputes of fact
      regarding whether there was sufficient probable cause for the charges, or whether the dismissal

26    was in Williams's favor considering Deputy DA Santos' testimony that she dismissed the charges
      out of "pity" for Williams against Williams's criminal defense attorney's testimony that he

27    contested the charges on the merits and Superior Court Judge Cuellar "agreed that a dismissal was
      appropriate" given defense counsel's representations about the case.  Declaration of Kelli Cooper,

28    Dkt. No. 194-1, ¶¶ 4-6.  To the extent there is a dispute of fact about the reasons for the dismissal,
      that dispute does not preclude summary judgment given the total lack of admissible evidence that

United States District Court
Northern District of California

**C.      Williams's Failure to Timely Respond to Requests for Admissions**

As a final argument, the ValleyCare Defendants assert that Williams's unexcused failure to timely respond to the ValleyCare Defendants' requests for admissions (served in December 2022, and responded to in June 2023) provides an independent and sufficient ground to grant their motion for summary judgment.  Those requests for admissions, for example, asked Williams to admit or deny that Frangieh never battered Williams and that none of defendants ever sent correspondence or communicated with the District Attorney to urge or encourage the filing of criminal charges.  ValleyCare MSJ at 18-19, Ex. 11.

As explained above, the ValleyCare defendants are entitled to summary judgement on both of Williams's remaining claims against them.  I need not reach this argument, but it provides a second ground for granting the motion for summary judgment.  *See, e.g., GTE Directories Corp. v. McCartney*, 11 F. App'x 735, 737 (9th Cir. 2001).[8]

The ValleyCare Defendants' motion for summary judgment is GRANTED in full.

## II.      POLICE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.      Detention & False Arrest**

**1.      Legal Standard**

The Pleasanton Defendants move to dismiss Williams's claims based on false imprisonment and false arrest. To prevail on her section 1983 claim for unreasonable seizure, false arrest, and false imprisonment, "[Williams] would have to demonstrate that there was no probable cause to arrest [her]."  *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998).

---

the ValleyCare Defendants had any communication with the District Attorney's Office in order to urge or encourage the filing of criminal charges.

[8] "It is clear that a district court may grant summary judgment based on deemed admissions. *See O'Campo v. Hardisty*, 262 F.2d 621, 624 (9th Cir. 1958). The question then becomes whether it is still appropriate to grant such a motion if the nonmoving party submits admissible evidence that contradicts the deemed admissions, yet fails to file a Rule 36(b) motion. We hold that it is. Rule 36(b) provides the exclusive remedy for withdrawal or amendment of admissions, and it provides that a court may do so 'on motion.' *See* Fed.R.Civ.P. 36(b); *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir.1987) ('[T]he proper procedural vehicle through which to attempt to withdraw admissions ... is a motion under Rule 36(b) to withdraw admissions.')." *GTE Directories Corp. v. McCartney*, 11 F. App'x 735, 737 (9th Cir. 2001).  Williams's non-compliance with her discovery obligations throughout this litigation, discussed in Section III, below, and failure to attempt to show good cause for this violation, more than justifies granting the motion on this ground.

United States District Court
Northern District of California

1    "Probable cause does not require proof beyond a reasonable doubt of every element of a crime."

2    *United States v. Noster*, 590 F.3d 624, 629 (9th Cir. 2009).  "Rather, probable cause exists where

3    under the totality of the circumstances known to the officer, a prudent person would have

4    concluded that there was a fair probability that the suspect had committed or was committing a

5    crime."  *Id.* at 629–30.  That the charges against Williams were eventually dismissed does not, in

6    itself, support a claim for unlawful arrest.  *See Baker v. McCollan*, 443 U.S. 137, 145 (1979)

7    ("The Constitution does not guarantee that only the guilty will be arrested.  If it did, [section] 1983

8    would provide a cause of action for every defendant acquitted—indeed, for every suspect

9    released.").  To prove her claim, Williams must "plead facts showing that the arresting officer did

10   not have probable cause to believe she committed a crime."  *Anaya v. Marin Cty. Sheriff*, No. 13-

11   CV-04090-WHO, 2014 WL 6660415, at *6 (N.D. Cal. Nov. 24, 2014).

12           Similarly, facing a civil claim for false arrest under California law, defendants are "*not

13   required* to show that the facts known to the officers were sufficient to prove that plaintiff actually

14   committed a crime.  Rather, it was sufficient to show that the officers were aware of facts that

15   would cause *a reasonable person* to suspect a crime had been committed.  Under this objective

16   standard, the officers' actual or subjective belief that plaintiff did or did not commit a crime is

17   irrelevant to the probable cause analysis."  *Levin v. United Air Lines, Inc.*, 158 Cal. App. 4th 1002,

18   1019 (2008), as modified (Jan. 14, 2008) (emphasis in original).  "The existence of probable cause

19   is a question of law if the underlying facts giving rise to the arrest are undisputed."  *Id.* at 1018;

20   *see also* Cal. Penal Code § 847(b)(1) (officers immune from false or false imprisonment if the

21   arresting officer has "reasonable cause to believe the arrest was lawful").[9]

22

23

---

24   [9] Defendants argue that I can reject Williams's detention or seizure claim, based on the lower
     "reasonable suspicion" standard.  *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (noting that

25   "the police can stop and briefly detain a person for investigative purposes if the officer has a
     reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if

26   the officer lacks probable cause." (internal citation omitted)).  I apply the probable cause standard,
     finding it satisfied, in part because once the police entered the room the investigatory detention

27   escalated into an arrest, especially once it became clear that Williams was refusing to leave the
     hospital room of her own accord and because the plan the officers agreed to before they went in
     was to ask Williams to leave voluntarily, but if she refused she would "go" on "a 242" (battery

28   pursuant to citizen's arrest) "in cuffs" or for trespass.

United States District Court
Northern District of California

### 2.      Detention and Arrest

The undisputed facts are that the officers arriving on scene (Bradley and Boccasile) responded to a dispatch call after being informed that Williams was the wife of a patient, was acting aggressively and threatening staff, and that the hospital staff wanted her removed.  Neither the dispatch report nor the dispatch call disclosed Williams's race.  Dkt. No. 182, Ex. E-1.  Upon arrival, the officers were informed by hospital security that Williams had been acting aggressively, swearing, and screaming at staff, and that the hospital staff wanted Williams removed.  Ex. N-1 at 14:46:37.  The officers were also informed by security that by time the first officers arrived, the scene was quiet and Williams (who was in the room with her husband) was calmer but that the nurse manager still "wanted her gone" because she was not cooperating.  BWC  14:41:52.

The nurse supervisor in charge met the arriving officers and reiterated the same basic facts as well as his request that Williams be removed based on her treatment of staff and interference with their ability to provide medical care.  *Id*. 14:42:30.  At least two officers then spoke with Frangieh, asking questions and ascertaining whether she wanted to file the citizen arrest for battery and explaining what that entailed.  Frangieh agreed that she wanted to proceed with the citizen's arrest.  *Id*. 14:43:54, 14:46:37.

The next officer to arrive (Emmet) was told those same basic facts and inquired whether the nurse wanted to proceed with the citizen's arrest.  *Id*. 15:04:44.  The final officer to arrive (Pittl) assessed the situation, spoke with Frangieh and confirmed she wanted to file a citizen's arrest) (*id*. 15:18:30, 15:21:13), spoke with Jonathan Rui (who purported to be the Williamses' attorney (*id*. 15:22:15), spoke with the nurse supervisor and other staff confirming that the hospital wanted Williams removed for her disruption (*id*. 15:31:34), spoke with the other officers confirming the plan to ask Williams to leave due to the battery (*id*. 15:33:06), spoke with Rui again (*id*. 15:33:25), and then entered the hospital room with Emmet to speak with Williams.  *Id*. 15:36:17.

Williams contests none of these facts.  They are captured on the BWC of the four officers.[10]

---

[10] In her declaration submitted in support of the opposition to the Pleasanton Defendants' motion

13

United States District Court
Northern District of California

1    Upon entering the room with Emmet, Pittl asked for Williams's version of the events

2    related to her alleged aggressive behavior.  He repeatedly tried to get Williams to focus on the

3    events of that day and not Williams's complaints about the medical treatment and alleged medical

4    mistreatment Dr. Williams had been receiving from the hospital staff.  BWC 15:36:27-15:40:33.

5    He repeatedly gave Williams the opportunity to leave the hospital room on her own volition, but

6    she did not respond.  Only when the officers went "hands on" and attempted to restrain and cuff

7    her did she say, "she would leave on her own."  The officers informed Williams that "it was too

8    late for that" now.  BWC at 15:42:10, 15:42:20, 15:43:17.

9    Based on this undisputed evidence, including the consistent information discussed above

10   that was provided by hospital security and the healthcare workers regarding Williams's disruptive

11   behavior as well as her battery on Frangieh, the officers had reasonable cause to arrest Williams

12   for the battery allegation based on Frangieh's intent to proceed with a citizen's arrest.  *See*

13   *Tensley v. City of Spokane*, 267 F. App'x 558, 560 (9th Cir. 2008) (finding probable cause for

14   arrest based on "detailed and broadly consistent" statements of two adult witnesses and other

15   indicia establishing the information was "reasonably trustworthy").

16   Williams makes only two points in opposition.  First, she says that the citizen arrest form

17   was not presented to Frangieh or signed until after Williams had been taken out of the hospital

18   _____

19   for summary judgment, Williams declares her personal belief that:

20   The Body Warn Camera ("BWC") footage taken by the four officers does not clearly show
     the vicious beating they inflicted on me. It is my view that the footage were intentionally

21   blocked, edited and/or deleted because I am 100% certain that office Pittl's body camera
     was recording from front in clear view without any obstruction and officer Boccasile from

22   the side when the beating went down. All four police officers body camera were recording
     the entire beating incident. The body camera never fell down, both of them never put their

23   hands to cover the beating, it was in clear view. This edited body camera has enabled all of
     them to say that it never happened. But they all are lying! Although the Pleasanton Police

24   and their attorneys have long claimed to have produced the entire footage without any
     editing, the truth is that all four officers' footage has been edited to remove every visual

25   aspect of the beating.

26   Williams Declaration (Dkt. No. 192-2), ¶ 25.  There is no evidence to support these personal
     beliefs.  Williams submits no evidence that the BWC videos were edited or otherwise manipulated

27   or not produced in full.  She has no expert on this subject and makes no challenge to defendants'
     expert, Robert McFarlane.  *See* Declaration of Noah G. Blechman (Dkt. No. 181-1), Ex. N

28   (McFarlane Expert Report).

1  room in cuffs and placed in the patrol car.  But she does not dispute that before the officers entered

2  the hospital room, they repeatedly asked Frangieh and confirmed that she wanted to press battery

3  charges and effect a citizen's arrest of Williams; the officers fully explained what that meant, and

4  Frangieh agreed multiple times.  Williams provides no authority that the citizen's arrest form had

5  to be signed *before* the arrest was effectuated to establish probable cause for the arrest.

6  Second, Williams complains that the officers could not have had probable cause because

7  they did not get her or Dr. Williams's side of the story before effectuating the arrest.  It is

8  undisputed that the arriving officers waited almost an hour for Officer Pittl to arrive before any

9  officer entered the room and attempted to speak with Williams or her husband.  But Pittl did

10  attempt to get Williams's side of the story, after gathering information from the other officers and

11  hospital staff and after speaking with Jonathan Rui.[11]  Williams points to *no evidence* that could

12  have caused a reasonable officer to question whether the battery against Frangieh occurred, that

13  Williams had been disruptive and had acted aggressively, or that the hospital staff wanted her

14  removed because she refused to leave.

15  Indeed, the information known to Pittl after the officers' investigation and before arresting

16  Williams included the consistent evidence of multiple witnesses regarding Williams's alleged

17  aggressive behavior and alleged battery, the consistent evidence that Williams had been asked to

18  leave the hospital but refused to do so, and that the hospital and hospital staff needed her removed

19  because she was interfering with their provision of care.  Williams points to no evidence or

20  caselaw suggesting that it was unreasonable for Pittl and the other officers to make a plan that

21  entailed entering the room, asking for Williams's perspective, asking her to voluntarily leave the

---

[11] Williams's arguments in opposition (and made more extensively in her declaration) focus on why her conduct on that day – trying to get hospital staff removed from the room, her refusal to leave the hospital room – was justified given the batteries and mistreatment she contends were inflicted on Dr. Williams by hospital staff and because she was the only one who could make medical decisions for Dr. Williams.  Her beliefs on those points were well-known to the Pleasanton Defendants, as they were informed of them by hospital security, by the nurse in charge, by Rui – all before they entered the hospital room – and from Williams herself after they entered the hospital room.  Her expert agrees.  Expert Report of Roger A. Clark ("Clark Report," Dkt. No. 190-1) at pg. 11, Opinion 1.

1    hospital room, and if she refused, effectuating the citizen's arrest for battery.[12]

2        During the hearing on the motions, Williams's counsel argued that because neither

3    Williams nor Frangieh were "injured" as a result of the contested battery, the officers had no cause

4    to remove her from the hospital based on the citizen's arrest for battery.  Transcript at 10:1-6;

5    11:1-3.  It is true that the officers confirmed, during their interviews with Frangieh, that she had no

6    obvious injuries and needed no immediate medical treatment.  *See* BWC at 14:48:24.  That is

7    immaterial.  A misdemeanor battery does not require an injury.  Nonetheless, defendants present

8    undisputed evidence that following the incident Frangieh filed a worker's compensation claim and

9    saw an occupational health doctor to discuss her anxiety and trouble sleeping stemming from the

10   incident.  *See supra* at pgs. 6-7.  None of Williams's arguments, made without any citation to

11   authority or caselaw, diminish the undisputed evidence that the officers had probable cause to

12   carry out the citizen's arrest for battery.

13       There is another, separate and independent ground on which probable cause existed to

14   detain and arrest Williams; trespass under California Penal Code section 602.[13]  Williams does not

15   dispute that she had been asked to leave the hospital by hospital security and refused to do so.  She

16   does not dispute that she was repeatedly asked to leave the hospital by Pittl before the officers

17   went "hands on" to remove her.  She does not dispute that the responding officers had received

18   consistent information that she had been swearing and acting aggressively towards staff in

---

[12] The investigation included speaking with multiple witnesses besides Frangieh, including the
nurse supervisor, the security staff, and Rui.  The consistent, detailed description of the events
provided by Frangieh and the others interviewed was a sufficient independent investigation to
support the citizen's arrest.  *See, e.g.*, *Arpin v. Santa Clara Valley Trans. Agcy.*, 261 F.3d 912, 925
(9th Cir.2003) ("In establishing probable cause, officers may not solely rely on the claim of a
citizen witness that he was a victim of a crime, but must independently investigate the basis of the
witness' knowledge or interview other witnesses."); *see also Peng v. Mei Chin Penghu*, 335 F.3d
970, 978 (9th Cir.2003) ("A sufficient basis of knowledge is established if the victim provides
'facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and
the named suspect was the perpetrator.").

[13] *See* Cal. Penal Code 602(o) ("Refusing or failing to leave land, real property, or structures
belonging to or lawfully occupied by another and not open to the general public, upon being
requested to leave by (1) a peace officer at the request of the owner, the owner's agent, or the
person in lawful possession, and upon being informed by the peace officer that they are acting at
the request of the owner, the owner's agent, or the person in lawful possession, or (2) the owner,
the owner's agent, or the person in lawful possession.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    addition to committing the purported battery, and that the nursing supervisor wanted her removed

2    because she was being "very disruptive."  She does not dispute that the responding officers

3    confirmed to her that she would still be able to make medical decisions for Dr. Williams, but

4    would have to do so over the phone and not in person by staying in the hospital room.  *See* BWC

5    at 15:36:17.

6           Williams and her expert, Roger A. Clark, believe that she was entitled to stay in the

7    hospital room and could not be forced to leave because Dr. Williams was paying for a private

8    hospital room and Williams was Dr. Williams' medical care decision-maker who had witnessed

9    significant maltreatment of her husband.  Clark opines that there is "nothing in record to justify the

10   use of force inflicted in Mrs. Williams in this incident."  He states that Williams had a "right of

11   lawful resistance" to oppose the "unlawful or unreasonable" force that the officers intended to use

12   to remove Williams from the room.  Clark Report, pg. 11-13, Opinions 1-2.

13          Williams, however, provides no authority or caselaw that precludes a hospital visitor (even

14   one who possessed medical power of attorney over a patient) from being required to leave and,

15   upon refusal, to be forcibly removed for disruption.  As noted above, the officers had consistent

16   information from multiple sources that Williams had been acting aggressively, not just including

17   the alleged battery but also swearing at staff and being "very disruptive" over a number of days.

18   The nurse in charge informed the officers (the arriving officers and separately Pittl) that they

19   wanted Williams removed because she was being disruptive.  *See* BWC starting at 14:42:30.[14]

20

21   ──────────
     [14] While Williams and Clark opine that a hospital is not private property, they cite no authority
22   that it is otherwise "open to the public."  *See, e.g., McInerney v. City & Cnty. of San Francisco*,
     466 F. App'x 571, 573 (9th Cir. 2012) ("McInerney cannot defeat summary judgment when he
23   presented no evidence that the [hotel] was open to the public, and likewise presented no evidence
     that Hughes did not have authority, as the owner's agent, to bar him from the premises."); *see also*
24   *Heyward v. Hayward Police Dep't*, No. 15-CV-04802-JCS, 2017 WL 2793805, at *8 (N.D. Cal.
     June 28, 2017), aff'd, 713 F. App'x 589 (9th Cir. 2018) (granting summary judgment where "a
25   reasonable person would have assumed that members are expected to heed the admonitions of club
     managers with respect to noise levels. Therefore, considering the totality of the circumstances, the
26   Court finds that a reasonable person would have concluded that there was a fair probability that
     Mr. Heyward was trespassing.").  It does not matter that Williams was not eventually arrested for
27   trespass.  The BWC recordings clearly show the officers discussing the plan to ask Williams to
     leave and if she refused to remove her to effectuate hospital's request.  *Bingham v. City of*
28   *Manhattan Beach*, 341 F.3d 939, 950 (9th Cir.2003) ("[P]robable cause may exist for an arrest 'for
     a closely related offense, even if that offense was not invoked by the arresting officer, as long as it
     involves the same conduct for which the suspect was arrested.'" (citation omitted)).

United States District Court
Northern District of California

1    There is no contrary evidence that Williams has identified that the officer defendants knew about

2    or ignored, or should have known about, that would have undermined probable cause to arrest

3    Williams for battery or trespass.[15]

4         Williams misses the point when she argues that the Pleasanton Defendants failed to submit

5    admissible, non-hearsay evidence to this court showing that what the officers were told by security

6    and healthcare staff was *true*; that she had been acting aggressively over a number of days, that

7    she was a disturbed family member upset over the medical treatment provided to her husband, that

8    she had screamed at and used abusive language towards staff,  and that she had battered Frangieh.

9    Pl. Oppo. to Pleasanton MSJ at 3-10.  The Pleasanton Defendants are not entitled to summary

10   judgment because those things are true; they are disputed by Williams.  But that dispute is not

11   material to the relevant legal issue: whether, based on the totality of the circumstances and

12   drawing all reasonable inferences in Williams's favor, "a prudent person would have concluded

13   that there was a fair probability that the suspect had committed or was committing a crime."

14   *Noster*, 590 F.3d at 629.

15        Taking all reasonable inferences in her favor, and given also that Williams was asked to

16   leave by hospital security and later by the responding officers but refused to do so, no reasonable

17   juror could conclude based on the undisputed material facts that defendants did not have probable

18   cause to arrest her for the battery under a citizen's arrest or for trespass.

19

20   _____

21   [15] In her opposition to the Pleasanton Defendants' motion and in her Declaration, Williams
     emphasizes the immaterial, but assumed to be true for purposes of this motion, facts regarding the
22   life-threatening medical malpractice committed against her husband in the days leading up her
     arrest, about the dangerously bad nursing care the defendants provided (including that two
23   defendants allegedly threw wipes at Dr. Williams and directed him to clean himself), about how
     Williams wanted to stay in the room because she was Dr. Williams' medical decision-maker, and
24   that Dr. Williams was incapacitated and unable to make his own medical decisions. Pl. Oppo. to
     ValleyCare MSJ at 8; Williams Decl. ¶¶ 7-8.  But the BWC evidence shows that – other than the
25   allegations regarding two nurses throwing wipes at Dr. Williams – the responding officers knew
     about the other allegations.  They knew Williams was very upset about the medical care provided
26   and that she or Dr. Williams had discussed with Rui the filing a malpractice claim.  They knew
     that she was dissatisfied with the medical care her husband was receiving and that she wanted him
27   transferred.  They knew that Williams was the medical decision-maker for Dr. Williams.  Pittl
     acknowledged all of these matters once he was in the room with Williams, while unsuccessfully
28   trying to get Williams's side of the events regarding the battery and her behavior that day.  BWC
     at 15:36:17.

**B.      Excessive Force**

**1.      Legal Standard**

Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures using the framework articulated in *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness of a seizure turns on "whether . . . officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," *id*. at 397, which the court determines by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396.

In conducting this inquiry, the court first assesses "the gravity of the particular intrusion on Fourth Amendment interests." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir.2003)).  The court then looks to "the importance of the government interests at stake," and finally balances "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id*. (quoting *Miller*, 340 F.3d at 964).

The reasonableness of force used is ordinarily a question of fact for the jury.  *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).  "Because [the excessive force] inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks and citation omitted); *see also Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) ("[W]e have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.").

But defendant officers "can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Liston*, 120 F.3d at 976 n.10 (citation omitted); *see, e.g., M.M. v. Cty. of San Mateo*, No. 18-CV-05396-YGR, 2020 WL 109229, at *5 (N.D. Cal. Jan. 9, 2020) (granting summary judgment on excessive force claim to defendants, where "[f]ew, if any, material facts [were] disputed in [the] matter to require a jury to sift through to reach a

conclusion" and the court "construe[d] the record in the light most favorable to plaintiff, drawing all inferences in favor of her where applicable"); *Hudlow v. Cty. of San Diego*, No. 18-CV-2826-CAB-WVG, 2020 WL 2934965, at *6 (S.D. Cal. Jun. 3, 2020) ("Construing the facts in the light most favorable to plaintiff, there is no triable issue: Defendants' use of force was objectively reasonable under the circumstances and did not violate the Fourth Amendment.").

### 2.     Hands On Force

Williams argues, supported by her use of force and police practices expert Roger A. Clark ("Clark Report," Dkt. No. 192-1), that any use of force to remove her from the hospital room was unreasonable as a matter of law because she was upset about the medical care given to her husband and was the medical decision-maker for him.  Clark Report, Opinion 1.  For the reasons discussed above in connection with the probable cause to arrest Williams for battery and trespass, that argument fails.  Significantly, the officers knew why Williams was so upset and repeatedly explained to her that she would be able to make medical decisions for Dr. Williams by phone, after she left the hospital.  *See* BWC at 15:36:17-15:44:50.  There is no dispute that Williams was first asked by hospital security to leave and then repeatedly asked to leave by the officers before they went "hands on."

Turning to the measures the officers employed once they went "hands on," Williams has repeatedly stated that the officers used unreasonable force and smashed her face into the ground, chocking her, hitting her, and twisting her arms.  Williams Decl. (Dkt. No. 192-2), ¶ 25.  That conduct is not captured on the BWC, as her expert admits.  He cannot say why that conduct is not captured, only that "a more refined and scientific evaluation beyond my present resources may be required."  *Compare* Deposition Tr. of Roger A. Clark (Dkt. No. 187) at 66:17-25 (noting "this was all grappling.  There's no punches, no kicks, no spits, none of that.") *with* Clark Decl. (Dkt. No. 192-1), ¶ 7.  The BWC footage has been provided to the court; each officer's footage was presented separately and synched by a defense expert.  Dkt. No. 182.  The Pleasanton Defendants present evidence that the footage is complete – albeit blocked at certain points as some cameras are pressed against Williams or the other officers for short periods of time, and one camera was "dropped" for a short while during the cuffing and removing of Williams.  *See* Deposition and

1   Declaration of Robert McFarlane, Dkt. No. 181-1, Exs., L & M.

2       In her declarations, Williams reasserts that the officers "jumped me and smashed my face

3   to the ground, choking me, hitting me and twisting my arms."  Williams Decl., Dkt. No. 191-1, ¶

4   24; Dkt. No. 192-2, ¶ 25.  She argues that the BWC recording does not show all aspects of the

5   "vicious beating" because the footage must have been edited or deleted and the officers are

6   "lying."  Dkt. No. 192-2, ¶ 25.  However, Williams offers no expert testimony that the footage

7   provided to the court has been edited or deleted to support those assertions or to counter the

8   representations of the defense expert.  At oral argument, Williams's own counsel described her

9   allegations of extreme use of force not captured on the BWC as "embellishments."  Transcript

10  8:21-22.

11      There is evidence that the officers grabbed, restrained, and twisted Williams's arms in their

12  effort to handcuff her and employed other basic "control measures" once they went "hands on."

13  There is no evidence, other than Williams's declaration that her own counsel describes as

14  "embellishments," that the officers "smashed" her face into the floor, or hit or choked Williams.

15  Those allegations are simply not plausible given what the BWC recordings (video and audio)

16  show.

17      Defendants' use of force expert, Robert J. Fonzi (Fonzi Report, Dkt. No. 181-1), opines

18  that the use of force – using "physical control measures" to place Williams in handcuffs as she

19  was "resisting" the force of the officers – was consistent with standard police practices.  *Id.* ¶¶ 3-5.

20  Williams's expert Clark admitted in his deposition that the officers were using "physical control

21  measures" when Williams tried to pull away, twist and verbally protest, as well as grab onto

22  tables, in an effort to resist the officers' attempt to handcuff her.  Clark Depo. Tr. (Dkt. No. 187) at

23  64:5-66:10; 67:1-7.  Clark's position is that any use of force was unreasonable; he also noted that

24  some of her actions once the officers went hands on were reasonable as a result of her surprise and

25  shock at the officers' conduct, and that at some point Pittl should have called the officers off and

26  offered Williams another chance to voluntarily leave.  *Id.* at 67:14:24; *see also* Clark Decl. (Dkt.

27  No. 192-1) at pgs. 6, 8.

28      Reviewing both experts' testimony, as well as the BWC, and drawing the reasonable

United States District Court
Northern District of California

1   inferences in Williams's favor, I conclude that no reasonable juror could find the officers' use of

2   force was unreasonable.

3        I first assess the "quantum of force used to arrest [Williams] by considering the type and

4   amount of force inflicted." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) (quotation

5   omitted). After officers repeatedly asked Williams to voluntarily leave and confirmed that she

6   would be able to make medical decisions for her husband by phone, she refused. Only then did

7   the responding officers go "hands on" and attempt to place Williams in handcuffs by grabbing and

8   restraining her arms behind her back. The measures they employed are basic control type

9   measures. Fonzi Decl., Opinions 3-4. Williams can be seen resisting, grabbing tables and then the

10  medical bed to prevent officers from handcuffing her, while the officers clearly instructed her to

11  "stop" resisting them. BCW at 15:42:10-15:43:17.

12       This low-level of force, when faced with undisputed resistance, was objectively justified.

13  *See, e.g., Donovan v. Phillips*, No. 3:14-cv-00680-CRB, 2015 WL 993324 (N.D. Cal. Mar. 4,

14  2015), *affirmed*, 685 Fed. Appx. 611 (9th Cir. 2017) (where officer instructed defendant several

15  times to stop and reenter vehicle, when defendant did not comply the officer was justified in using

16  the "low level" wrist control hold by which he gripped and twisted her right wrist, causing

17  Williams to twist "to avoid pain in her arm and wrist as Defendant applied pressure," and forced

18  her to the ground). That Williams may have been injured by the low level types of force applied

19  did not mean she has a claim. *See id.* *5 (holding the use of wrist control hold to effect

20  compliance was a "minimal intrusion" on plaintiff's Fourth Amendment rights, given it was "low

21  level" force, a lack of evidence that the level of force "caused or was capable of causing grave

22  physical injury", and plaintiff "had no legal right" to disregard the officer's orders); *see also*

23  *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1097 (9th Cir. 2006) ("Faced with a

24  potentially violent suspect, behaving erratically and resisting arrest, it was objectively reasonable

25  for Smith to use a control hold to secure Fullard's arm long enough to place him in handcuffs.").

26       Once Williams actively resisted, the officers had independent probable cause to arrest her

27  because she violated Penal Code section 148(a)(1) for resisting arrest. *See Muehler v. Mena*, 544

28  U.S. 93, 99 (2005) ("[R]ight to make an arrest . . . necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it.") (citation omitted).  When viewed in the light most favorable to Williams, this physical force was "among the lowest levels of force peace officers are trained to use when a subject does not respond to verbal commands."  *See Donovan*, 2015 WL 9933324, at *5.

I evaluate the government's interest in the use of force by examining three core factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  The analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving."  *Graham*, 490 U.S. at 396–97.  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*. at 396.

Here, the key is Williams's continued refusal to voluntarily leave and the officers' reasonable belief that Williams had been acting aggressively towards staff, including the battery against Frangieh, and needed to be removed to stop her disruption. While the officers may not have been under threat, there was evidence that hospital staff were under a threat to their safety. Aside from that, once the officers went hands on, Williams is shown resisting.  The amount of force applied did not exceed what was reasonable in the circumstances.

The officers' decision to arrest Williams with handcuffs was informed by the totality of the circumstances, including the repeated attempts to convince her to leave voluntarily, the location of the encounter in a hospital where the officers reasonably believed that her conduct was interfering with the provision of medical care, and her refusal to leave voluntarily, despite being told she could still make medical decisions for her husband over the phone after leaving.  Assuming that Williams's resistance was not active, but just passive as a result of her surprise or shock at the situation, there is no evidence (other than Williams's unsupported "embellishments") that the use of force exceeded anything other than low level force. See, e.g.,  *M.M. v. Cnty. of San Mateo*, No. 18-CV-05396-YGR, 2020 WL 109229, at *9 (N.D. Cal. Jan. 9, 2020), *aff'd*, 843 F. App'x 954 (9th

Cir. 2021) ("[g]enerally, an officer is permitted to use a higher level of force where an individual is actively resisting, as opposed to passively resisting" but "'[e]ven passive resistance may support the use of some degree of governmental force if necessary to attain compliance, however, the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.'" (citing *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012)); *see also Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Officers [] need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.").

As discussed, putting Williams's embellishments aside, she "was subjected to only a low level of force, such that the Defendant did not bypass the number of less painful measures to control the situation that the Ninth Circuit observed in *Young*." *Donovan*, 2015 WL 993324 at *6; *see Young*, 655 F.3d at 1166 (concluding that the defendant's use of intermediate force, pepper spray and multiple baton strikes, bypassed "the availability of other, less intrusive measures" and "ma[de] clear just how limited was the government's interest in the use of significant force").

Ultimately, the severity of "the force which is applied must be balanced against the need for that force." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003); *Young*, 655 F.3d at 1166. Considering the undisputed facts and taking disputed facts in the light most favorable to Williams, I find that the government's interest outweighs the nature and quality of the intrusion. As detailed extensively above, the officers reasonably could have believed that Williams posed a danger to hospital staff and Dr. Williams' medical care when she refused to comply with lawful orders to voluntarily leave the hospital room. The force that they used was not excessive and did not violate the Fourth Amendment.

### 3.   Qualified Immunity Would Apply

To the extent that there could be a genuine dispute of material fact concerning the reasonableness of the amount of force used on Williams, defendants are entitled to qualified immunity. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017). Qualified immunity involves two questions: (1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation. *Isayeva*, 872 F.3d at

United States District Court
Northern District of California

1   945.  An officer may be denied qualified immunity at summary judgment in a section 1983 case

2   "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show

3   that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly

4   established at the time of the incident such that a reasonable officer would have understood [his]

5   conduct to be unlawful in that situation."  *Id.* (citation omitted); *see also id.* at 950 (declining to

6   reach the first prong of qualified immunity and finding it "sufficient for purposes of qualified

7   immunity merely to conclude that no clearly established law was violated by Deputy Barry in

8   connection with his use of a taser against the resisting Tereschenko").

9          To meet the "clearly established" requirement, "[t]he contours of the right must be

10  sufficiently clear that a reasonable official would understand that what he is doing violates that

11  right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  This requires defining the right

12  allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  *Id.*

13  "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

14  reasonableness is judged against the backdrop of the law at the time of the conduct."  *Brosseau v.*

15  *Haugen*, 543 U.S. 194, 198 (2004).  "[T]his inquiry must be undertaken in light of the specific

16  context of the case, not as a broad general proposition."  *Hamby v. Hammond*, 821 F.3d 1085,

17  1091 (9th Cir. 2016) (emphasis in original) (internal quotation marks and citation omitted).

18         Williams provides *no caselaw* to show that the officers' conduct after repeatedly asking

19  her to leave voluntarily – going hands on and employing low level physical measures to remove

20  her due to her alleged battery and other aggressive behavior and in light of the trespass and the

21  hospital's need for her to leave – violated any clearly established right such that a reasonable

22  officer would have understood their use of force to be unlawful.  Williams cites no cases at all

23  (other than attempting to distinguish defendants' case cited in support of probable cause for

24  trespass).  Williams's expert, Clark, just *assumes* Williams had the lawful right to remain at the

25  hospital (despite the trespass and battery misdemeanors, that as discussed above were based on

26  probable cause) and then had the lawful right to resist the force of the officers when they

27  attempted to handcuff her.  *See generally* Clerk Report, Dkt. No. 190-1.

28         Williams has failed to meet her burden, on summary judgment, of showing a clearly

United States District Court
Northern District of California

established violation of a constitutional right.  *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).  Accordingly, I find that the officer defendants are entitled to qualified immunity.

Defendants' motion for summary judgment on Williams's excessive force claim is GRANTED.

### C.     Due Process

The Pleasanton Defendants also move for summary judgment on Williams's due process claim, arguing that to the extent it is a substantive due process claim, it can only success if the officers' conduct "shocks the conscience."  *See Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.'" (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)).

In her opposition, Williams clarifies that this claim is not based on the manner of her arrest or the amount of force used.  Instead, it is based on Williams's belief that the police should have declined to carry out the arrest itself, considering the medical mistreatment Dr. Williams had suffered and Williams's need to stay in the room and make medical decisions for her husband.  Instead, the officers proceeded to remove and arrest her for the alleged battery and because the hospital staff wanted her removed from the premises.  Pl. Oppo. to Pleasanton MSJ, Dkt. No. 192, at 22-23.  The fact of the arrest in these circumstances is what, according to Williams, "shocks the conscious" and shows "deliberate indifference."  She notes the long amount of time that officers were onsite and saw that all was calm before entering the room and giving her the ultimatum of voluntarily leaving or being removed.  *Id*.  She contends that the officers should have sought out her side of the story before attempting to remove her for the citizen's arrest and battery.  She also argues that if the officers believed that they had the right to remove her as a trespasser simply because hospital staff wanted her removed, they should have and could have sought advice from their attorneys.  *Id*. at 23.  In sum, she alleges that once Pittl showed up he exhibited "complete indifference" to her need to remain as the medical decision-maker for her husband given the shocking lack of care that the ValleyCare Defendants were providing to her husband.  *Id*.

26

United States District Court
Northern District of California

1    The Pleasanton Defendants' motion for summary judgment is GRANTED on the due

2    process claim.  As discussed above, the officers interviewed numerous people once they arrived on

3    site and carefully formulated their plan based on their probable cause to arrest Williams for battery

4    and trespass.  The officers, especially Pittl (who developed the final plan before entering the

5    hospital room) was fully informed of Williams's side of the story and why Williams was upset

6    about the medical treatment being provided to Dr. Williams.  Pittl informed Williams why she

7    needed to leave as well as how she could still exercise the medical decision-making for her

8    husband.

9        In sum, Williams fails to allege facts, and again cites no caselaw, to support a due process

10   claim.  Even if she is correct that all of the defendants and other hospital staff lied to the officers

11   about her behavior, in order to cover up their own medical malpractice or for whatever reason,

12   there is no basis to conclude that the *officers'* behavior rises to the high level of conduct that

13   "shocks the conscience."

14       **D.      Equal Protection**

15       The Pleasanton Defendants move for summary judgment on the equal protection claim,

16   arguing that Williams has submitted no evidence that she was arrested or otherwise treated any

17   differently from others based on her race.  Defendants point out that there was no indication of her

18   race in the police dispatch call or report, and no evidence that any of the officers were informed of

19   or knew of Williams's race before they entered the hospital room.  They only entered the hospital

20   room after Pittl announced the plan to ask her to leave to be forcibly removed from the hospital

21   room.

22       In support of her equal protection claim, Williams identifies only a series of comments that

23   she alleges Emmet made directly to her and then to Emmet's colleagues after Williams was

24   arrested and in the patrol car.  Pl. Oppo. to Pleasanton MSJ (Dkt. No. 192) at 23-24.  Specifically,

25   she alleges that Emmet told her that she "could not find any criminal records under your name.

26   It's highly unusual for people of your race to have no criminal records."  Ellen Williams Decl.

27   (Dkt. No. 192-2), ¶¶ 29-32.  Williams argues that evidence, construed in her favor, outweighs

28   Emmet's testimony that she did not make that statement and creates a dispute of material fact

precluding summary judgment on the equal protection claim.

Assuming that Emmet made the comments alleged and made them with discriminatory animus, there is *no evidence* that Emmet or any of the Pleasanton Defendants knew of Williams's race before the plan was made to secure Williams's removal from the room. That plan was made before Pittl and Emmet entered the hospital room and first saw her. The plan is what led directly to Williams's arrest for battery and then, resisting arrest. Emmet's alleged comments occurred after the arrest. There are no grounds to support an unequal treatment based on race claim with respect to Williams's arrest for battery or resisting arrest.[16]

The Pleasanton Defendants' motion for summary judgment is GRANTED on Williams's equal protection claim.[17]

### E.   Negligence

Under California law, "tactical conduct and decisions preceding the use of deadly force" may "give[ ] rise to negligence liability" if they "show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes v. County of San Diego*, 57 Cal.4th 622, 626 (2013). However, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in" success of the officer's objective. *Id.*, 160 Cal.Rptr.3d 684 (quoting

---

[16] The fact that Emmet had to leave Williams in the patrol car and return to the hospital to get Frangieh to fill out and sign the Citizen's Arrest form does not help Williams. The BWC recordings show the officer's repeatedly confirming with Frangieh her intent to effect a citizen's arrest for the battery before they entered the hospital room, and Emmet herself states that she would wait to get the form from her car until after Pittl arrived and the form was needed.

[17] Defendants are also entitled to summary judgment on Williams's Ralph Act claim for the same reason; lack of any probative evidence that Williams was told to leave the hospital room or be forcibly removed and was subsequently arrested for battery and resisting arrest *because of her race*. *See* Cal. Civ. Code § 51.7(b)(1); § 51(b) (the Ralph Act provides all people in California with "the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of" a protected characteristic, including race."); *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167 (N.D. Cal. 2009) *amended in part* (Sept. 8, 2009) (a plaintiff alleging a Ralph Act violation must show: "(1) the defendant threatened or committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of plaintiff's race; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm.").

*Brown v. Ransweiler*, 171 Cal. App. 4th 516, 537-38 (2009)).  Moreover, as in the Fourth

Amendment context, the reasonableness of a particular use of force under California negligence

law "must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

Assuming that a negligence cause of action can be asserted here, based on use of non-

deadly force, the claim fails as a matter of law.  The use of minimal physical force as described

above by the officers on the scene, given what they knew as a result of their reasonable

investigatory efforts and their efforts to get Williams to voluntarily leave, was reasonable.[18]

Williams, as noted, cites no caselaw or other authority that would support a negligence claim,

much less one that found negligence based on similar facts.

Defendants' motion for summary judgment on the negligence claim is GRANTED.

### F.    Bane Act

Finally, the Pleasanton Defendants move for and are entitled to summary judgment on

Williams's Bane Act Claim.  *See* Cal. Civ. Code § 52.1(a) (creating a right of action against any

person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by

any individual or individuals of rights secured by the Constitution or laws of the United States, or .

. . of this state."  In *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947 (2012), the court

clarified that the Bane Act "was intended to address only egregious interferences with

constitutional rights, not just any tort. The act of interference with a constitutional right must itself

be deliberate or spiteful." *Id.* at 959.  The court also explained that the statute requires a showing

of coercion independent from the coercion "inherent" in the constitutional deprivation.  *Id.* at 962;

*see also Sandoval v. Cty. of Sonoma*, No. 11-CV-05817-TEH, 2016 WL 612905, at *3 (N.D. Cal.

Feb. 16, 2016) (where the constitutional deprivation was an unlawful search and seizure, the court

followed *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015) and held "that a Bane Act

---

[18] To the extent this claim is based on Williams's arrest, and not on the force used, the defendants are immune under California Penal Code section 847(b).  *See id.* ("(b) There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer . . . acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest . . . . [where] The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful.").

search and seizure claim requires threats, intimidation or coercion separate from the coercion inherent in the search and seizure itself.").

Williams identifies no evidence showing that the Pleasanton Defendants made a threat, or attempted to intimidate or coerce her to give up any constitutional right, (apart from the coercion involved when defendants asked Williams to voluntarily leave the room or be removed and then proceeded to remove her). The Bane Act claim against the Pleasanton Defendants fails.[19]

The Pleasanton Defendants' motion for summary judgment is GRANTED in full.

### III.   MOTION FOR SANCTIONS FOR VIOLATING COURT ORDER RE DEPOSITIONS

Before addressing defendants' motion for sanctions for Williams's non-compliance with my Order of June 6, 2023, it is worth considering the dismal history of her conduct related to discovery obligations in this case. Between May 26, 2022, when I sanctioned her $1350 for failure to provide discovery, and June 13, 2023, when I addressed certain relevance issues after the parties had resolved other discovery issues, I issued eight other orders resolving discovery disputes, mostly but not totally in defendants' favor. *See* Dkt. Nos. 100, 113, 124, 127, 128, 134, 139, 157, 162, and 174. To say that issuing ten orders on discovery matters in little more than a year is unprecedented in my court is to put it mildly.

In my order on June 6, 2023, in response to further motions from defendants seeking to compel discovery, I granted in part defendants' motion and ordered that further depositions, limited in time and subject matter, be taken of Williams, Dr. Williams and third-party Sokea Kiep. Dkt. No. 171; *see also* Dkt. No. 157. Despite repeated requests from the defendants for dates that these 3 individuals were available (made on July 21 and 24, and again on August 1, 11, 16), Williams's counsel never provided dates. Instead, as shown in the declaration filed in opposition to the motion for sanctions, Williams's counsel said that she was busy, she promised further dates, and no dates were provided. Dkt. No. 189. Believing that the discovery needed to be completed

---

[19] In her opposition, Williams apparently confuses her Bane Act claim with her Ralph Act claim. Pl. Oppo. to Pleasanton MSJ at 26 (arguing the evidence of "racist animus" she identified with her equal protection claim applies to and saves her Bane Act claim).

United States District Court
Northern District of California

before September 7, 2023 (the expert discovery cut-off date), on August 28, 2023, defense counsel served notices for the depositions to be held on September 6, 2023.  Williams's counsel did not object or otherwise respond to those notices until after work hours on September 5, 2023, when she emailed objections to the deposition notices.  Defense counsel appeared on September 6, 2023, at the noticed time to make a record, and neither Williams's counsel nor Williams nor the other witnesses showed up.

As a result of Williams's failure to provide dates, and failure to move for relief from the noticed date when Williams, Dr. Williams and Kiep were no-shows, defendants seek the following actions:

- An order precluding testimony regarding topics 1.1;[20]

- An order compelling Williams to appear for her deposition to testify on topics 1.2, at a date and time unilaterally chosen by defendants;[21]

- An order finding as admitted Topic 4;[22] namely that Pena was terminated from Dr. Williams' business (NCCC) after she received $100,000 for providing false information to police;

- An order precluding Dr. Williams from testifying on any of the topics covered by prior Order granting defendants' motion to compel;

- An order precluding testimony from Kiep regarding topics covered by prior the Order granting defendants' motion to compel;

- Reimbursement by Williams of the attorney fees and costs defense counsel incurred in attempting to set dates and for the failure to appear.

In opposition, Williams's counsel (Sunena Sabharwal) explains that the failure to provide dates resulted because she and her co-counsel were busy with related litigation (also involving

---

[20] Topics 1.1 cover whether Williams is "claiming any 'income loss,' including the value of her services from a lessened work schedule, due to the 11/14/19 incident as a result of or related to the [ValleyCare] Defendants' actions."  Dkt. No. 157.

[21] Topics 1.2 cover these witnesses "percipient knowledge of events and communications that took place on or around 11/14/19 and Williams's resulting injuries or damages from those events." *Id*.

[22] Topic 4 covered the justifications for the termination of former employee Pena.  *Id*.

defense counsel). She argues that she did not necessarily agree that the depositions ordered by me needed to take place before the expert discovery cut-off, and points out that defense counsel knew that she had a deposition in related proceedings on August 7, 2023 and that she was unavailable from August 23 through September 1, 2023. She declares that she did not appear on September 6, 2023 because of a mandatory appearance in another matter and that her co-counsel James Braden had emergency dental work that day and was also unable to appear. Dkt. No. 189.

Responding to the substance of defendants' request for various forms of sanctions, Williams's counsel suggests that my prior order (requiring further depositions, limited in duration and topic) was unnecessary when issued and is particularly unnecessary now. *Id.* To support that argument Williams attaches new declarations from Williams, Dr. Williams and Ms. Kiep covering parts of the topics covered by my prior Order. Dkt. Nos. 189-1, 189-2, 189-3.

At the hearing on the motion, based on the record, I indicated I was inclined to GRANT the motion and award sanctions against Williams in the amount of the fees and costs that defense counsel: (1) spent meeting and conferring about dates for the depositions; (2) issuing the deposition notices; (3) appearing on September 6, 2023 to make the record; and (4) incurred time related to this motion and the reply. Defense counsel was ordered to file a declaration identifying those costs; that declaration was filed on November 2, 2023. Dkt. No. 204. Williams was ORDERED TO SHOW CAUSE why sanctions should not be awarded in that amount. Dkt. No. 202.

Defendants' motion for sanctions is GRANTED in part under both Rule 37 and my inherent authority. Sanctions under Rule 37 are appropriate given Williams's counsel's repeated failure to provide dates for the depositions that I ordered must go forward and for notifying defense counsel at the very last minute that the final noticed date did not work. That conduct left defense counsel no choice but to have to move again for sanctions and/or a further order requiring Williams to sit for her further deposition. They are also warranted under my inherent authority for Williams's failure to comply with my order requiring Williams and the two witnesses to sit for depositions. Counsel's attempt to reargue a closed matter, the necessity of the depositions, and attempting to rely on supplemental declarations that are no substitute for depositions, amounts to

willful abuse of the judicial process.[23]

The fact that I have granted defendants' motions for summary judgment ending the case in this Order does not alter this conclusion. Defendants were forced to move *again* for the Court's assistance to *require* Williams to comply with court-ordered depositions, to preserve their ability to secure evidence if this case proceeded to trial. Defendants should not have had to incur those fees and costs, because Williams apparently did not want to provide dates for the deposition or because Williams's counsel was not forthcoming in providing dates for those depositions to go forward. Defense counsel should be reimbursed for those costs.

Turning to the amounts to be awarded, Williams filed her response to defense counsel's declarations regarding fees and costs on November 7, 2023. Dkt. No. 206. With regard to the ValleyCare Defendants time and costs request, Williams objects to $600 charged by defense counsel for preparing for the depositions that did not go forward. That objection is SUSTAINED. Williams also objects to $1870 related to costs charged by the court reporter. However, assuming that charge was paid by defendant at the regular rate for a court reporter where the deposition did not go forward but a record was made, that objection is OVERRULED. Williams objects that eight hours to file the motion for sanctions and five hours to review the opposition and file the reply are excessive, proposing an award of three hours for the motion and 2.5 for the reply are more reasonable. That objection is OVERRULED. Therefore, **within thirty (30) days of the date of this Order Williams's counsel SHALL PAY the reasonable fees and costs incurred by ValleyCare's counsel (Zenere Cowden & Stoddard) in the amount of $5,182.38**.[24]

---

[23] At one point during the hearing, Williams's counsel expressed frustration, asking what she could do when her client would not provide deposition dates. Transcript at 15:10-20. Counsel are expected to be forthright and clear with the court. If the reason no deposition dates were provided to defense counsel is because Williams herself refused to cooperate with her lawyer, she should have raised this in opposition to the sanctions motions in camera or otherwise, not for the first time at the hearing. Whatever the reason, defendants should not have had to come to court yet another time to secure dates or evidentiary sanctions related to court-ordered depositions. Williams's counsel had three months from my order to agree to short depositions for her client, Dr. Williams and Sokea Kiep. Failure to do this is inexcusable.

[24] Whether these amounts are ultimately borne by Williams's counsel or by Williams personally is not determined by the Court and may be worked out between counsel and client. However, in order to ensure defense counsel recover the fees and costs they should not have had to incur, payment shall be made by Williams's counsel.

United States District Court
Northern District of California

Williams objects to the Pleasanton Defendants' time and costs request, Dkt. No. 205, arguing that counsel charged too much time for reviewing and joining the motion, reviewing the opposition, and filing their declaration. Those objections are OVERRULED. Williams's objection to being charged for deposition preparation time is SUSTAINED. **Therefore, within thirty (30) days of the date of this Order, Williams's counsel SHALL PAY the reasonable fees incurred by the Pleasanton Defendants' counsel (McNamara, Ambacher, Wheeler, Hirsig & Gray LLP) of $1307.00**.

## IV.    SECOND MOTION FOR SANCTIONS; FOR VIOLATING COURT NO-CONTACT ORDERS

In June 2022, the ValleyCare Defendants moved for sanctions (terminating, evidentiary, and compensatory) based on a host of discovery issues, including Williams's repeated failure to timely or fully respond to discovery, but also based on Williams repeatedly and personally contacting defendants and defense counsel instead of having communications go through counsel. *See* Dkt. Nos. 103-109. In a minute Order following the August 24, 2022 hearing, I ordered as follows:

> The Court ORDERS, and will issue a separate written order, that plaintiff Williams SHALL NOT communicate with defense counsel or any defendant. Any such future communications will subject her to possible personal sanctions by the Court.

Dkt. No. 113. In the separate written Order, I made clear:

> Plaintiff Williams SHALL NOT communicate with defense counsel or any defendant to this case (or employees of defendants to this case). Any such future communications will subject Williams to personal monetary or case sanctions by the Court.

Dkt. No. 114.

Nevertheless, on March 29, 2023, Williams violated that Order and emailed defense counsel directly, and defense counsel moved against for sanctions (terminating, evidentiary, or compensatory). Dkt. Nos. 146, 151. After reviewing Williams's response (arguing that the email was directed to third parties and only cc'd defense counsel) and defendants' reply, I issued another Order:

> Both sides' requests for sanctions are DENIED. I agree with defendants that by cc'ing counsel on the email to the third-party,

United States District Court
Northern District of California

Williams arguably violated the spirit if not the letter of my August 2022 Order. But the underlying communication itself is not egregious and contains the kind of information (that the plaintiff is contacting a witness) that counsel would appreciate knowing (although not directly from a party who has been specifically ordered not to contact him). After receiving that communication, reasonable counsel should have then communicated with each other. For example, defense counsel should have conferred with Williams' counsel, asking them to remind Williams of the Court's August 2022 Order and their belief that cc'ing counsel on emails violated that Order. If counsel needed clarification on the scope of my August 2022 Order, they could have submitted a request for clarification through a joint letter brief or through a joint administrative motion for clarification.

I understand that litigation between these parties (pending in both federal and state court) is unusually contentious. There are strong feelings on both sides. But seeking sanctions for this one occurrence – even considering Williams' past conduct identified by defendants, e.g., failing to provide timely and complete discovery and deposition responses, necessitating defendants' motions to compel, and the prior improper contacts with counsel – lacks merit and does not rise to the level of justifying terminating, issue, or monetary sanctions.

**<u>To be clear</u>**, plaintiff should not communicate or direct communications **<u>in any manner</u>** with defendants or defense counsel. That includes cc'ing defendants or defense counsel on emails or other correspondence directed to others. If plaintiff directly or indirectly communicates with defendants or defense counsel in the future, I will consider that conduct to be **<u>willful and in bad faith</u>**. That conduct will lead to Orders to Show Cause and potential imposition of financial sanctions to be paid **<u>personally</u>** by plaintiff and possible issue or terminating sanctions.

May 4, 2023 Order, Dkt. No. 157 (emphasis in original).

On October 23, 2023, Williams sent defense counsel in this case an unsolicited email, attaching court rulings from unrelated litigation Williams was involved in with a third-party witness in this case (Jonathan Rui) and threatening defense counsel in this case that:

[W]hen this case is over, I will report [defense counsel in this case] to the State Bar for knowingly filing a perjured declaration with the Court from Rui and [Williams's attorney in this case] will be the witness because Stoddard has told Braden many times that he knows Rui is a liar, he doesn't believe anything he says but used a false declaration in an attempt to intimidate me hoping that I will dismiss the action. State Bar is fully aware of the situation. . . . Like I said before, we have nothing to hide and trying to intimidate us and harass us will NEVER work!

Dkt. No. 188-2.[25]

---

[25] In October 2022, defendants filed a motion to compel the production of documents produced by Jonathan Rui, and to compel Williams's testimony regarding the same. Dkt. No. 132. Williams

United States District Court
Northern District of California

Defense counsel moved, again, for imposition of sanctions against Williams for this most recent violation of my Order.  They argue that terminating sanctions are appropriate given: (1) Williams's repeated violations of my orders not to contact counsel; (2) the blatant purpose to harass individuals with the intent to influence testimony in this case, in violation of 18 U.S.C. § 1512; (3) the multiple, substantiated discovery delays and consistent violation of discovery orders that have required defense counsel to file multiple motions to secure discovery and move for sanctions to enforce discovery orders; and because (4) nothing short of termination will apparently convince Williams to comply with court orders.  Dkt. No. 188.

In the alternative to terminating sanctions, defense counsel seek evidentiary sanctions, essentially finding that Williams has no evidence to prove her case against defendants.  *Id*.  As the least preferred sanction, defendants argue that Williams should be required to reimburse defense counsel for *all* of the many motions they have had to file in this case to attempt to secure discovery from Williams and, at a minimum, at least the costs defense counsel have incurred in filing this, latest motion for sanctions.  Dkt. No. 188; Declaration of Adam M. Stoddard [Dkt. No. 188-2] at ¶ 5 (identifying $2640.00 in expected attorney fees plus costs to submit this motion).

Williams opposes and files a "counter-request" for sanctions of her own.  Dkt. No. 199.  As to the violation of the repeated "no-contact" Order, Ms. Williams argues that she did not believe the sanctions order covered communication with defense counsel here because those individuals (Stoddard and Cowden) are also defense counsel in a different case, pending in state court where her husband Dr. Williams is a party.  Declaration of Ellen Williams In Opposition to

---

opposed arguing that Rui at relevant times was acting as her and/or her husband's attorney and, therefore, the documents and testimony was protected by the attorney-client privilege.  Dkt. No. 135.  As part of that process, defense counsel submitted a declaration from Rui ("Rui Declaration") wherein Rui claimed he was never an attorney for Williams, her husband, or the Northern California Cancer Center.  Dkt. No. 132-2.  I concluded that sufficient evidence of an attorney-client relationship existed for specific periods of time and concerning specific issues.  Dkt. No. 127.  That conclusion protected some of the information at issue, but I subsequently found that the privilege did not cover or was waived with respect to numerous communications shared with third parties and ordered Williams to answer questions regarding those communications.  Dkt. No. 139.  In state court litigation between Rui and Williams and Dr. Williams, Rui contended he was not an attorney for the Williamses.  However, in a deposition taken in June 2023, Rui admitted that the declaration he signed in 2022 saying he had never been Williams's attorney was false.  Dkt. No. 199-1.

1    Sanctions, Dkt. No. 199-1, ¶ 2.  That excuse is meritless for several reasons, one of which is that

2    there is no evidence that Blechman (who represents the Pleasanton Defendants) and was cc'd on

3    the email is involved in that state court medical malpractice action.  The email at issue specifically

4    references Williams's belief that the Rui Declaration – submitted in this case in connection with

5    defendants' motion to compel discussed in n.12 above – was perjured and that she intends to

6    report Stoddard and Cowden to the State Bar.  Dkt. No. 188-2, Ex. 1.

7            Williams attempts to justify sending the email because she felt it was her "civic duty to

8    point out to defense counsel" that they were obligated to correct the record and inform me that the

9    Rui Declaration submitted in this litigation was perjured.  Williams also wanted to tell defense

10   counsel her belief that they knew the Rui Declaration was perjured, but submitted it to me anyway,

11   and that therefore defense counsel violated rules as well as the duty of candor owed to this court.

12   Dkt. No. 199, ¶¶ 3-11.  She argues that her communication did not violate my clear orders, but

13   even if it did, I should consider the "circumstance" that she believed she was "furthering strong

14   interests of justice by reminding counsel of their obligations to take remedial measures," with

15   respect to Rui's perjury.  Oppo. to Second Mot. for Sanctions (Dkt. No. 199) at 3-4.  She makes a

16   "counter-request" that I determine whether defense counsel violated their ethical rules in this

17   court, as she believes it was "highly probable" that defense counsel were fully aware that Rui was

18   acting as an attorney for one or both of the Williams at the time they submitted the Rui

19   Declaration in support of defendants' motion to compel.  She rests that assertion in large part on

20   the police BWC video that show Rui at the hospital on November 14, 2019 prior to her arrest and

21   Rui stating on the video that he was "their attorney" (referencing Williams and Dr. Williams).

22   Oppo. to Second Mot. for Sanctions at 5-6.

23           During the November 1, 2023 hearing on defendants' motions for summary judgment and

24   the motion for sanctions addressed above, I invited defense and Williams's counsel to address this

25   motion and Williams's apparent violation of my May 2023 Order.  The hearing on the sanctions

26   motion had been set for November 15, 2023, but as of November 1 Williams's opposition to the

27   sanctions motion had been filed and considered, and defendants' reply was filed just prior to the

28   commencement of the hearing.  Williams's counsel was given a full opportunity to address any

United States District Court
Northern District of California

point raised in the motion or in her opposition.  There was no need for a further hearing and I vacated the November 15, 2023 hearing.  Dkt. No. 202.  In the Minute Order following the November 1 hearing, I explained that I was inclined to sanction Williams personally for violating my no-contact Order, directed defense counsel to file a declaration substantiating their expenses incurred in bringing this second motion for sanction based on Williams's improper communications with defense counsel, and issued an ORDER TO SHOW CAUSE requiring Williams to respond to the defense declaration and justify why she should not be sanctioned for the violation of the May 2023 "no-contact" Order. Dkt. No. 202.

Defendants filed their declaration substantiating their expenses; $2760.00 in attorney fees related to this motion.  Dkt. No. 203.  Neither Williams nor Williams's counsel filed a response.

I find based on undisputed evidence that Williams willfully and in bad faith violated my May 2023 "no-contact" Order (that repeated and clarified my August 2022 Order).  *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001) (inherent authority sanctions may be based on "bad faith" and "reckless" conduct undertaken for an "improper purpose").  The lawyers on the To: line of Williams's email are Adam Stoddard and Marc Cowden, the lead counsel in this case for the ValleyCare Defendants.  Noah Blechman is listed on the cc:line, lead counsel for the Pleasanton Defendants.  Regardless of whether some of those counsel are involved in the state court litigation, sending the email violated my clear, plain and direct May 4, 2023 Order.  Williams's justifications for sending the email do not excuse her conduct.  The goals Williams declares that she had in sending that email could have been easily satisfied without violating the Order; *i.e*., by having her counsel communicate with defense counsel regarding the Rui Declaration or by taking whatever reporting action Williams felt was appropriate with the State Bar.

Williams's concern about defense counsel's veracity with this court, and potential violations of their duty of candor – that have not been substantiated and I do not find occurred based on this record – could be and still can be raised by her counsel if there is cause to do so.  But there is simply no excuse or justification for Williams's violation of my May 4, 2023 Order, and doing so in a manner threatening defense counsel with reports to the State Bar "[w]hen our case is over" and accusing them of trying to intimidate and harass Williams and her husband.  *See Fink*,

239 F.3d at 992 ("sanctions are justified when a party acts for an improper purpose—even if the act consists of making a truthful statement or a non-frivolous argument or objection"); *id*. at 994 ("sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose").

I have reviewed the declaration of Adam M. Stoddard identifying the time expended in bringing this motion and find them reasonable.

Therefore, **IT IS ORDERED that within thirty (30) days of the date of this Order, Williams is personally required to pay $2,760 to ValleyCare's counsel** (Zenere Cowden & Stoddard), to compensate counsel for the reasonable fees incurred in bringing this motion based on Williams's clear and blatant violation of the Court's no-contact Order.

Williams's request for my "assistance" to uncover alleged misconduct by defense counsel related to the Rui Declaration is DENIED. I do not preclude Williams's counsel from bringing a noticed motion on this topic if they have a good faith basis for doing so.

## CONCLUSION

Accordingly, I GRANT the defendants' motions for summary judgment. Judgment will be entered accordingly.

Williams's counsel shall pay Zenere Cowden & Stoddard $5182.38 and McNamara, Ambacher, Wheeler, Hirsig & Gray LLP l $1307.00. Williams, personally, shall pay Zenere Cowden & Stoddard $2760.00. Those payments, required as sanctions for the reasons given above, shall be made within 30 days of this Order.

**IT IS SO ORDERED.**

Dated: November 28, 2023

William H. Orrick
United States District Judge